2003 SD 96

**MOONLIGHT ROSE COMPANY,**
**Appellant,**

v.

**SOUTH DAKOTA UNEMPLOYMENT INSURANCE DIVISION, South Dakota Department of Labor, Appellee.**

**No. 22350.**

Supreme Court of South Dakota.

Considered on Briefs Oct. 8, 2002.

Decided Aug. 6, 2003.

Thomas K. Wilka of Hagen, Wilka & Archer, Sioux Falls, SD, for appellant.

Lawrence E. Long, Attorney General, Pierre, SD, Drew C. Johnson, Special Assistant Attorney General, Aberdeen, SD, for appellee.

ZINTER, Justice.

[¶ 1.] Moonlight Rose Company (Moonlight) appeals from a circuit court decision affirming a decision of the Department of Labor. Both concluded that Moonlight's retail rose sellers were employees, rather than independent contractors. Therefore, Moonlight was required to make contributions to the unemployment insurance compensation fund. We affirm.

## FACTS

[¶ 2.] Moonlight entered into written agreements with Dan Long, Lana Dykshorn, Wendy Albers and Renee Hagedorn (sellers). The agreements required Moonlight to provide roses, flower tubes, uniforms and sales materials to the sellers. Sellers were required to use those supplies to sell roses to customers in bars and restaurants in and around Sioux Falls. The sellers' compensation was the difference between Moonlight's suggested sales price of $3.50 and the $2.51 the sellers

were required to remit to Moonlight for each rose sold. Although the agreement provided that Moonlight had the right to establish the price at which the roses would be sold, testimony at the hearing indicated that sellers were allowed to set their own price. The sellers were not, however, liable for flowers they did not sell as long as the flowers were returned to Moonlight undamaged. Whenever there were two or more sellers working the same evening, Moonlight would suggest sales routes to prevent the sellers from covering the same area. The agreements also contained a clause prohibiting the sellers from selling for others or from "compet[ing] with [Moonlight] for a period of two years following the termination of [the] Agreement." The non-compete area included Minnehaha, Lincoln and Brookings counties, or "within a 70 mile radius thereof." [1]

[¶ 3.] Although each seller had a peddler's license issued by the City of Sioux Falls, no seller had a sales tax license. Instead, Moonlight paid the sales tax under its license. The sellers did not advertise to increase rose sales, did not have a "place of business" for selling roses, and did not have business cards representing themselves as rose sellers. None of the sellers engaged in any independent rose selling business for themselves or for any other company. Three of the four sellers had other unrelated employment during the time they sold roses for Moonlight, and Hagedorn owned an unrelated, independent business. [2]

[¶ 4.] The South Dakota Unemployment Insurance Division (SDUID) determined that Moonlight's sellers were "employees and must be reported for state unemployment insurance tax purposes." Moonlight appealed SDUID's determination. A hearing examiner and the circuit court upheld SDUID's decision. Moonlight now appeals raising one issue:

**Whether Moonlight's sellers were independent contractors under SDCL 61–1–11, thereby exempting Moonlight from contributing to the unemployment compensation fund.**

### STANDARD OF REVIEW

[¶ 5.] Our standard of review, delineated in SDCL 1–26–36, is settled. We must:

> [G]ive great weight to the findings and inferences made by the Department on factual questions. We examine agency findings in the same manner as the circuit court to decide whether they were clearly erroneous in light of all the evidence. If after careful review of the entire record we are definitely and firmly convinced a mistake has been committed, only then will we reverse. Questions of law, of course, are fully reviewable.

*Sopko v. C & R Transfer Co., Inc.,* 1998 SD 8, ¶ 6, 575 N.W.2d 225, 228 (internal citations omitted). The determination of employee or independent contractor status, for purposes of unemployment insurance, is a mixed question of law and fact. It is fully reviewable by this Court. *Egemo v. Flores,* 470 N.W.2d 817, 820 (S.D. 1991).

### DECISION

[¶ 6.] Moonlight argues 1) that six of the hearing examiner's findings of fact are clearly erroneous; and 2) that its sellers

---

1. We express no opinion on the enforceability of the non-compete clause.

2. Hagedorn owned a house-cleaning business. Long worked as a fireman, Dykshorn worked primarily for UPS and a country club, and Albers had "other employment or was a student."

qualify as independent contractors under SDCL 61–1–11.

## I.

### Clearly Erroneous Findings of Fact

■ [¶ 7.] Moonlight first argues that administrative Findings of Fact 3 and 6 are clearly erroneous. These findings state:

3. Under the written agreement, Moonlight Rose agrees to provide the Agents with all flowers, tubes, uniforms and sales materials at no cost to the Agents. Moonlight Rose and the Agents further agree that Moonlight Rose establishes the price at which the products are to be sold, and the Agents are expected to remit 75 percent of the price for each flower sold to Moonlight Rose at the end of each night's business.

6. Under the written agreement, the Agents further agree that they will not compete with Moonlight Rose for a period of two years following the termination of the agreement within Minnehaha, Lincoln, and Brookings Counties, or within a 70 mile radius of these counties.

The hearing examiner based these findings on the employment agreement. We have reviewed that agreement and agree that it supports the findings.

[¶ 8.] Nevertheless, Moonlight argues that the non-compete clause mentioned in Finding 6 is void and therefore should not be considered. However, the *enforceability* of the non-compete clause is irrelevant for purposes of this appeal. What is relevant is the fact that the *non-compete language* used by Moonlight evinces its intent to prevent the sellers from engaging in independent work of the same nature if their relationship with Moonlight terminates. The clause is relevant because it is evidence that sellers were not engaged in

an independently established trade or business. *See* ¶ 17, *infra.*

■ [¶ 9.] Moonlight next argues that Findings of Fact 11 and 16 are clearly erroneous in light of the testimony presented at the administrative hearing. Finding 11 states:

11. Because the Agents do not have coolers in which to store flowers for a long period, he or she picks up the flowers at Moonlight Rose's place of business each evening that he or she is going to sell. Agnes Hoff, the owner of Moonlight Rose, instructs each Agent where to sell flowers that evening if there is more than one agent selling that evening.

[¶ 10.] Moonlight argues Agnes Hoff does not "instruct" each seller where to sell flowers each evening if there is more than one person selling. However, before the administrative hearing, Hoff filled out a SDUID questionnaire that asked, "does the firm assign a specific territory to the worker?" Hoff answered in the affirmative. Notwithstanding that answer, Hoff testified at the administrative hearing that "I have suggested routes, different sales people work different routes." Relying on this testimony, Moonlight argues that Finding 11 is clearly erroneous. It claims that Hoff merely "suggested," rather than "assigned" routes. However, in light of Hoff's written answer, Finding of Fact 11 is not clearly erroneous.

■ [¶ 11.] Finding of Fact 16 states:

16. Moonlight Rose provides one uniform to each Agent, coolers in which to transport the flowers for the evening, baskets in which to carry the flowers into the establishments, and a nametag. The nametag bears the name of the Agent and Moonlight Rose. Moonlight Rose requires the Agent to wear a tuxedo uniform, however, Agents can make

some modifications to that tuxedo uniform.

Moonlight argues that this finding is misleading because it only supplied the tubes, coolers and baskets "as a convenience." However, Moonlight's written agreement unequivocally states that Moonlight "agrees to provide [the sellers] with all flowers, tubes, uniforms and sales materials at no cost to [seller]." Considering Moonlight's written agreement, Finding 16 is not clearly erroneous.

[¶ 12.] Moonlight also argues that it did not "require" the sellers to wear its uniform (the tuxedo). Moonlight relies on the hearing testimony of Hagedorn who stated that Moonlight only "suggested" that they wear the tuxedo. Again, however, Moonlight's employment agreement provided that Moonlight "agrees to provide [sellers] ... uniforms ... at no cost to [the seller]." Furthermore, although each seller testified that Moonlight did not require them to wear the tuxedo, the sellers further testified that they did wear the tuxedo or some similar attire.

[¶ 13.] Moonlight finally argues that although Findings of Fact 19 and 23 are technically correct, the findings are misleading. Those findings state:

19. Albers, Long, Dykshorn, and Hagedorn do not have coolers or baskets in which to store or transport flowers, do not have business cards, and do not advertise under any business listing.

23. The Agents do not have sales tax licenses. Moonlight Rose pays the sales tax due on the sale of the roses.

[¶ 14.] Although Moonlight challenges Findings 19 and 23, it provided no evidence that all of its sellers had their own baskets or business cards.[3] Additionally,

sellers testified that they did not advertise, nor did they have their own business listings. Finally, the evidence established that sellers did not have their own sales tax license. Moonlight paid the taxes under its sales tax license until this dispute started, at which time sellers attempted to obtain sales tax licenses. Findings of Fact 19 and 23 are not clearly erroneous.

## II.

### "Employees" versus "Independent Contractors" Under SDCL 61–1–11.

[¶ 15.] SDCL 61–1–11 lists the requirements necessary to establish entitlement to independent contractor status for purposes of unemployment insurance. The statute provides:

Service performed by an individual for wages is employment subject to this title unless and until it is shown to the satisfaction of the department of labor that:

(1) The individual has been and will continue to be free from control or direction over the performance of the service, both under his contract of service and in fact; and

(2) The individual is customarily engaged in an independently established trade, occupation, profession or business.

[¶ 16.] A two-part burden of proof applies to determine employee/independent contractor status under SDCL 61–1–11. *Appeal of Hendrickson's Health Care Service*, 462 N.W.2d 655, 658 (S.D.1990) (additional citations omitted). First, the Department of Labor has the burden to show that the alleged employees provide services for wages.[4] *Id.* Once the Depart-

---

**3.** The hearing transcript shows that Hagedorn indicated she had her own cooler but that

does not render the finding clearly erroneous as to Long, Albers, or Dykshorn.

**4.** SDCL 61–1–1(17) defines wages as all re-

ment establishes this threshold showing, the burden shifts to the employer to prove:

> [T]hat the employee meets the elements outlined in both subdivisions (1) and (2) of SDCL 61–1–11, i.e., that the individual performing services is free from a certain degree of direction and control *and* that the individual is customarily engaged in an independently established trade or business. The burden is on the employer, "to prove the employees are independent contractors under the elements of SDCL 61–1–11."

*Shoppers Guide v. Department of Labor,* 1996 SD 92, ¶ 8, 551 N.W.2d 584, 586 (quoting *Hendrickson,* 462 N.W.2d at 658). Because we find that Moonlight failed to satisfy its burden of establishing the second requirement—that its sellers were engaged in an independent business under SDCL 61–1–11(2)—we do not reach the "freedom from control" issue under SDCL 61–1–11(1).

### Independently Established Trade or Business

[¶ 17.] In order to meet its burden under SDCL 61–1–11(2), Moonlight must show that the sellers:

1. were engaged in an enterprise that was created and exists apart from their relationship with Moonlight and that the enterprise would survive the termination of that relationship;

2. have a proprietary interest in the enterprise to the extent that they can operate without hindrance from any other individual;

3. due to their skill, are engaged in an economic enterprise such that the sellers bear the risk of unemployment; and

4. remain employed as a function of market forces and the demand for the sellers' skills, rather than the response of an employer to similar economic realities.

*See Davis v. Frizzell,* 504 N.W.2d 330, 331–32 (S.D.1993) (citing *Hendrickson,* 462 N.W.2d at 659). All four prongs of this test, either explicitly or implicitly, require that the individual have some relationship with an economic enterprise that is independent of the relationship with the company that is allegedly subject to unemployment insurance taxation.

[¶ 18.] Our decision in *Hendrickson,* 462 N.W.2d 655, provides guidance on this issue. Hendrickson's Health Care Services (HHCS) provided in-home nursing services to its clients. HHCS maintained a list of available nurses and nurse's aids with varying skill levels. *Id.* at 656. When a client contacted HHCS, the health care provider consulted the list to choose a nurse with skills adequate to care for that client. *Id.* The nurse could choose wheth-

---

muneration paid for services, including commissions and bonuses. The hearing examiner found sufficient evidence to establish that sellers performed services for wages. The hearing examiner found that:

> [t]he nature of Moonlight Rose's business that is under consideration in this case involves the Agent personally peddling flowers to patrons of restaurants, nightclubs, and other public establishments. As a result, the individual buying the flower personally pays the Agent. At the end of the evening, the Agent gives Moonlight Rose its

share of each flower that was sold and retains his or her share. The Agent can return any unsold flowers and is not required to pay $2.51 for any unsold flower. I conclude that under these circumstances, Moonlight Rose paid remuneration to the Agents for their services, and the evidence establishes that Moonlight Rose paid wages to the Agents and others similarly situated.

Moonlight has not appealed these findings. Therefore we assume (without deciding) that the hearing examiner was correct.

er to accept the referral, and if accepted, the nurse and client determined the nurse's work schedule and scope of duties. *Id.*

[¶ 19.] In *Hendrickson* we listed several relevant factors to determine whether SDCL 61–1–11(2) is satisfied.

[I]t is not skill alone which determines whether an individual is established in a trade or business, but whether that individual by reason of such skill engages herself in an economic enterprise such that she bears the risk of her own unemployment. Whether or not she is unemployed is solely a function of market forces and the demand for her skills, not the response of her master to similar economic realities. Here, there was no evidence that the care providers held themselves out to the public as engaged in an independent business which would exist separate and apart from HHCS; they did not advertise their health care services, they did not have any clientele independent of that provided by HHCS, and they did not have business premises or business cards. Furthermore, the care providers could be dismissed from HHCS for violating the provisions of the "Subcontractor's Responsibilities" document. Thus, it is clear that the care providers were not assuming the risk of unemployment by engaging in an economic enterprise independent of HHCS. They were employed by HHCS and dependent upon it for their livelihood. Consequently, HHCS fails the second prong of SDCL 61–1–11.

*Id.* at 659.

[¶ 20.] We find that this case is analogous to *Hendrickson*. First, sellers did not assume the risk of their own unemployment. Instead, their employment was dependant upon Moonlight's response to economic realities and the market's need for a rose selling service. There is also no evidence that any of the sellers sold flowers independent of their relationship with Moonlight. Significantly, Long testified that if it wasn't for Moonlight he would not sell roses. Second, Moonlight's rose sellers did not hold themselves out as independent businesses by way of business cards or advertising. Third, Moonlight supplied each seller with basically all of the necessary items for this business. Fourth, there is no record evidence that the sellers maintained a business premise for selling flowers apart from Moonlight. Although Moonlight argues that each seller had his or her own peddler's license and that this should weigh in Moonlight's favor, each peddler's license lists "Moonlight Rose Company" as the seller's business name. Finally, the sellers did not have sales tax licenses, but instead relied on Moonlight's license. The fact that each seller applied for a sales tax license after this proceeding commenced is irrelevant, because before this became an issue, the sales tax could only be paid by Moonlight. The evidence is insufficient to show an independently established economic enterprise in the flower business.

[¶ 21.] Moonlight also contends that it should only be considered a flower wholesaler, arguing that sellers had the ability to purchase roses anywhere. This argument fails for several reasons. First, we find it particularly significant that, pursuant to the agreement, Moonlight retained liability for the unsold roses. Sellers had no liability for unsold flowers. If sellers were purchasing their roses from a flower wholesaler, they would have been liable for all roses used. Second, the sellers' written agreement expressly prohibited the sellers from competing against Moonlight. This restriction is not indicative of a wholesaler relationship. Third, Moonlight did much more than simply wholesale flowers. In addition to providing a product, Moonlight

supplied the coolers, tubes, baskets, name-tags, and uniform, and Moonlight offered no evidence to establish that flower wholesalers generally provide this equipment. Moreover, Long testified that there were no other businesses like Moonlight in the Sioux Falls area. These facts do not indicate a wholesaler/independent contractor relationship.

### Moonlight is distinguishable from other precedent

[¶ 22.] We finally note that this case is materially distinguishable from the cases cited by Moonlight. In *Egemo*, 470 N.W.2d at 821, the log cutters were independent contractors under SDCL 61–1–11. However, when Egemo no longer had work available for the cutter who was the subject of the appeal, the cutter went out of state to continue cutting timber. *Id.* at 823. That fact demonstrated that the cutter took the risk of his own unemployment and that his trade as a log cutter existed independently of his relationship with Egemo. *Id.* Moreover, the cutter had a substantial proprietary interest in his skill as a log cutter, as well as the equipment necessary for his trade. *Id.* at 818.

[¶ 23.] Unlike *Egemo*, there is no evidence in this case that the sellers would continue selling roses absent their relationship with Moonlight. Furthermore, Moonlight supplied all *necessary* materials such as coolers, tubes, baskets, and initially, a tuxedo. The fact that the sellers paid their automobile expenses and purchased additional clothing is only incidental to their employment, and it alone does not create independent contractor status.

[¶ 24.] Moonlight cites *South Dakota Dept. of Labor v. Tri State Insulation Co.*, 315 N.W.2d 315 (S.D.1982) for the proposition that an independent contractor need invest in no more than an "automobile and a ballpoint pen." *Id.* at 317. However, the facts in *Tri State* are also distinguish-able. The salespeople in *Tri State* were significantly more independent than the rose sellers. The *Tri State* salespeople did their own advertising and were not required to report to, nor did they receive supervision from Tri State. Furthermore, unlike Moonlight's sellers, the salespeople in *Tri State* provided sales services for other companies, including Tri State's competitors. Therefore, if Tri State Insulation had gone out of business, those salespeople could have continued to sell for other enterprises. Because of these distinctions, Moonlight's reliance on *Tri State* is misplaced.

[¶ 25.] Finally, Moonlight contends that *Shoppers Guide* controls. *Shoppers Guide* is distinguishable because the paper carriers were not subject to a non-compete clause. Furthermore, in *Shoppers Guide*, the newspaper only supplied the paper carriers with a bag for carrying the papers. *Shoppers Guide*, 1996 SD 92 at ¶ 13, 551 N.W.2d at 588. In this case, Moonlight supplied the rose sellers with the tuxedo, coolers, tubes, baskets, and a name tag with the Moonlight logo. Finally, the rose sellers were much less independent from Moonlight than the paper carriers were from the Shopper's Guide.

[¶ 26.] Because Moonlight failed to establish that its sellers were "customarily engaged in an independently established trade, occupation, profession or business" under SDCL 61–1–11, Moonlight's sellers were employees, not independent contractors.

[¶ 27.] Affirmed.

[¶ 28.] GILBERTSON, Chief Justice, and SABERS and KONENKAMP, Justices, and AMUNDSON, Retired Justice, concur.

[¶ 29.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.